UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KENNETH PAUL DESCOTEAUX,<br><br>                          Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>                          Respondent. | CASE NO. C18-5325 BHS<br><br>(16-cr-5246 BHS & 17-cr-5074 BHS)<br><br>ORDER DENYING PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE AFTER EVIDENTIARY HEARING |

This matter comes before the Court on Petitioner Kenneth Descoteaux's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Dkt 1. The Court has considered the briefing filed in support of and in opposition to the motion, the testimony at the evidentiary hearing held March 1, 2022, the post-hearing briefing, and the remainder of the file and hereby denies the motion for the reasons stated herein.

## I.   FACTUAL & PROCEDURAL BACKGROUND

**A.    Factual Background**

On April 28, 2016, Descoteaux was charged by complaint in the Western District of Washington with one count of aggravated sexual abuse of a minor. *United States v. Descoteaux*, No. 16-cr-5246 BHS ("2016 Case"), Dkt. 1. He was arrested in Wyoming

1    the same day. *Id.*, Dkt. 4. On May 25, 2016, Descoteaux was charged by indictment in

2    this District with three counts of Aggravated Sexual Abuse of a Child, one count of

3    Abusive Sexual Contact with a Child, and one count of Assault. *Id.*, Dkt. 6.

4         On June 9, 2016, Descoteaux was also indicted by a grand jury sitting in the

5    Western District of Louisiana, Lake Charles Division. *See United States v. Descoteaux*,

6    No. 16-cr-0141-JDC-KK. The Louisiana indictment charged Descoteaux with two counts

7    of Aggravated Sexual Abuse of a Child, two counts of Indecent Behavior with a Juvenile,

8    and one count of Aggravated Assault. *Id.*, Dkt. 1.

9         The charges in each indictment were based on allegations that Descoteaux

10   subjected his minor stepdaughter ("MV") to repeated acts of sexual abuse occurring

11   between 2011 and 2015 in Louisiana and Washington. 2016 Case, Dkt. 1. During this

12   period, Descoteaux was married to MV's mother, Jayme Howard, and the family lived at

13   Fort Polk in Louisiana and at Joint Base Lewis-McChord in Washington. *Id.*, Dkt. 43.

14   From 2014 to 2015, Howard was deployed overseas, leaving MV alone with Descoteaux

15   as her sole caretaker. *Id.*, Dkt. 1. By 2016, the family had moved to Cheyenne, Wyoming.

16        In February 2016, a social worker at MV's elementary school contacted law

17   enforcement after MV told a classmate about the abuse. *Id.* An investigation ensued, and

18   in mid-February MV "disclosed to the [child forensic] interviewer" that Descoteaux "had

19   sexually abused her over a period of 3 years . . . and that the abuse started when she was

20   8-years-old." *Id.* ¶ 9.

21        Investigators interviewed Descoteaux several times. The remaining issue in this

22   case involves Descoteaux's April 22, 2016 interview. *See generally* Dkt. 18. The criminal

complaint provides that after receiving a warning pursuant to *Miranda v. Arizona*, 384

U.S. 436 (1966), Descoteaux "freely and voluntarily" waived his rights at the April 22

interview. 2016 Case, Dkt. 1, ¶ 18. He then provided a statement to an FBI agent

acknowledging "that he engaged in 65 instances of sexual acts with [MV] while they

were living in Louisiana and Washington." *Id.* After he confessed, the FBI agent allowed

Descoteaux to leave. He was arrested six days later on April 28, 2016, *id.*, Dkt. 4 at 7, the

same day that prosecutors filed a complaint against him in this District, *id.*, Dkt. 1. This

Court appointed Assistant Federal Public Defender Linda Sullivan to represent

Descoteaux on the charges pending in the Washington indictment. *Id.*, Dkt. 11.

Sullivan began negotiating a plea agreement on Descoteaux's behalf. By January

2017, the parties had reached an agreement to transfer the Louisiana indictment to this

district pursuant to Federal Rule of Criminal Procedure 20 in anticipation of a joint

resolution of the charges then pending in two districts. 2016 Case, Dkt. 27. In February

2017, the Louisiana charges were transferred to this District and opened in a new case as

*United States v. Descoteaux*, No. 17-cr-5074 BHS ("2017 Case").

Less than a month after transfer of the Louisiana indictment, Sullivan moved to

withdraw as Descoteaux's attorney "due to a breakdown in the attorney-client

relationship." 2016 Case, Dkts. 30, 31. In February 2017, the Court granted the motion

and terminated Sullivan's representation. *Id.*, Dkt. 34.

In March 2017, the Court appointed attorney Lance Hester to represent

Descoteaux. *Id.*, Dkt. 36. Descoteaux alleges that Hester advised him that he was bound

by Sullivan's plea negotiations. Dkt. 1 at 13. The Government asserts that Hester's plea

1    agreement was "similar to [Sullivan's agreement] in nearly all respects." Dkt. 7 at 8–9.

2    Ultimately, Hester negotiated a plea agreement that allowed Descoteaux to plead guilty to

3    one count from each indictment, specifically, Abusive Sexual Contact with a Child in

4    violation of 18 U.S.C. §§ 2244(a)(5), 2246(3), and 7 (Count 4 of the Washington

5    indictment) and Indecent Behavior with a Juvenile in violation of 18 U.S.C. §§ 7 and 13,

6    and Louisiana Revised Statute §§ 14.81(A)(1) and (H)(2) (Count 3 of the Louisiana

7    indictment) (collectively, the "charged offenses"). 2016 Case, Dkt. 43, ¶ 1. In exchange,

8    the Government agreed to dismiss the remaining counts from both indictments. *Id.*

9          On September 5, 2017, the Court held a sentencing hearing and sentenced

10   Descoteaux to 276 months to run concurrently on each charge within the guideline

11   range.[1] 2016 Case, Dkt. 57; 2017 Case, Dkt. 26. The Court advised Descoteaux that he

12   "gave up [his] right to appeal this judgment based on [his] plea of guilty." Dkt. 7-1 at 57.

13   The Court also advised that he had waived his right to appeal the sentence because the

14   Court had imposed a sentence within the guideline range. *Id.*

15         On April 23, 2018, Descoteaux filed the instant motion to vacate, set aside, or

16   correct sentence pursuant to 28 U.S.C. § 2255, asserting a claim for ineffective assistance

17   of counsel under three legal theories (Grounds I, III, and IV) and a claim that the Court

18   failed to find a factual basis to enter judgment on the plea (Ground II). Dkt. 1. On

19

20        [1] At the sentencing hearing, the Court determined that Descoteaux's net offense level was
     39 and that his criminal history category was I. Based on these findings, Descoteaux faced a
21   guideline sentencing range of 262 to 327 months. Dkt. 7-1 at 34; *see also* U.S. Sent'g Guidelines
     Manual § 5A (U.S. Sent'g Comm'n 2016) (showing sentencing guideline for offender with net
22   offense level of 39 and criminal history category of I).

November 22, 2019, the Court denied the motion in part but also granted an evidentiary

hearing reserving ruling on the merits in part on Ground I and Ground III. Dkt. 18. After

a delay because of the COVID-19 pandemic, the Court held an evidentiary hearing on

March 1, 2022 and received evidence on: (1) whether Descoteaux entered into a plea

agreement unintelligently/involuntarily (Ground I); and (2) whether his prior counsel

failed to provide adequate representation, causing him to enter this plea (Ground III). *See*

Dkt. 30.

**B.    Evidentiary Hearing**

The Court heard testimony from six witnesses on whether Descoteaux's prior

counsel provided ineffective assistance by failing to pursue a suppression motion and

advising Descoteaux to enter a plea of guilty: Dr. Tyson Bailey, Descoteaux's forensic

psychologist; Richard Smith, Descoteaux's polygraph expert; Descoteaux; Lance Hester;

Special Agent Andrew Stearns, who conducted the April 22, 2016 interview; and Special

Agent Tory Smith, who conducted an interview with Descoteaux approximately one

week before the April 22 interview. *See* Dkt. 35; Dkt. 40 ("Transcript").

**1.    Dr. Tyson Bailey**

Descoteaux was referred to Dr. Bailey for a forensic psychological assessment to

determine if any mental health conditions are present and, if so, how his mental health

may have impacted his interpretation of events during the April 22 interview. Dkt. 34 at

2. Dr. Bailey interviewed Descoteaux on December 14, 2020, January 11, 2021, and

January 14, 2021. *Id.* at 1. Dr. Bailey's assessment results indicated that Descoteaux "has

chronic posttraumatic stress disorder, to a reasonable degree of psychological certainty."

*Id.* at 8. Dr. Bailey further concluded that Descoteaux's "posttraumatic symptoms likely interfered with his ability to engage in that level of logical analysis during the [April 22 interview.]" *Id.*

Dr. Bailey testified at the evidentiary hearing that Descoteaux's posttraumatic symptoms include hypervigilance, intrusive experiences, disturbances in mood, and limited sense of his self or his internal state. Transcript at 12:6–19. Moreover, Dr. Bailey opined that Descoteaux exhibits symptoms of avoidance strategies, which when faced in a confrontational atmosphere manifest in a desire to remove himself from the situation as quickly as possible. *Id.* at 13:12–21. The presence of a gun is more likely to trigger posttraumatic symptoms. *See id.* at 15:21–16:12. In sum, Dr. Bailey testified that Descoteaux is "much more likely than someone without PTSD" to move toward avoidance behavior and try to end the situation as quickly as possible. *Id.* at 15:1–10. It is Dr. Bailey's opinion that it was more probable than not that he was experiencing PTSD symptoms during the April 22 interview. *See id.* at 18:19–23. Dr. Bailey did not offer an opinion, however, on whether the April 22 interview resulted in a false confession. *Id.* at 18:15–18.

### 2.    Richard Smith

Richard Smith is a nationally certified polygraph examiner with the American Polygraph Association ("APA"). Dkt. 32-1 at 1. Smith reviewed documents associated with Descoteaux's case to advise on whether the polygraph procedure and approach on April 22 was in compliance with "published polygraph professional standards and ethics." *Id.* at 2. APA standards dictate that, *inter alia*, "[t]he examiner shall conduct the

1    examination in a neutral manner and shall not display or express any bias regarding the

2    truthfulness of the examinee prior to the completion of testing." *Id.* at 3. Under APA

3    standards for conducting a polygraph examination, the subject completes a waiver and

4    release form, gives their informed consent to be tested, and is informed that they can stop

5    the testing process at any time. *See* Transcript at 57:10–14. The examiner then begins the

6    pre-test interview phase where the examiner collects basic information from the subject,

7    followed by the suitability assessment to inquire into the subject's mental and physical

8    health. *See id.* at 57:15–25. The examiner next discusses the case facts with the subject,

9    and the examiner and subject develop test questions. *See id.* at 58:1–6. The polygraph

10   exam then commences, and there is a standardized evaluation process to determine the

11   results. *See id.* at 58:7–15.

12       Specifically, Smith reviewed Descoteaux's version of events: that when he arrived

13   for his polygraph appointment on April 22, he was instead interrogated by an FBI

14   polygraph examiner wearing a handgun in plain view. Dkt. 32-1 at 4. Smith concluded in

15   his report that if Descoteaux's version of events is true, the FBI examiner violated APA

16   policies and ethics. *Id.* Smith testified at the evidentiary hearing that the April 22

17   examination should have never taken place because Descoteaux had previously told law

18   enforcement that he did not recall the alleged sexual conduct with MV. *See* Transcript at

19   60:7–24. Because Descoteaux asserted that he did not recall the abuse, Smith testified

20   that a key feature of a polygraph under APA standards—being able to answer a question

21   with a "yes" or "no"—was not possible. *See id.* at 61:9–62:17. Smith also identified

22   issues with the April 22 interview in that the polygraph exam shifted from an

1  examination to an interrogation and that a gun was present and visible. *See* Dkt. 32-1 at

2  3–4; Transcript at 62:18–63:9

3  **3.     Kenneth Descoteaux**

4  Descoteaux served in the United States Army from 2002 until 2011 when he was

5  honorably discharged due to a back injury. Transcript at 70:14–20. During his service, he

6  witnessed charred bodies and rocket attacks. *Id.* at 70:21–71:6. He first began noticing

7  PTSD symptoms in 2003 after his first deployment and testified that his symptoms

8  seemed to get worse after every deployment. *Id.* at 71:22–72:3. Descoteaux additionally

9  stated when his PTSD manifests, he feels like he is stressed and will want to get away

10  from that feeling. *Id.* at 71:7–18. These feelings can rise to a panic, and Descoteaux

11  testified that he will feel that a situation could become life-or-death. *Id.* When these

12  feelings arise, he stated he will "do whatever is necessary to exit that situation quickly."

13  *Id.* at 71:17–18.

14  On April 22, 2016, Descoteaux participated in a previously scheduled polygraph

15  interview with FBI Special Agent Andrew Stearns. *See id.* at 72:19–73:1. Descoteaux

16  testified that he was going to the polygraph exam to deny any recollection of the events

17  alleged. *Id.* He further testified that, when he arrived, Special Agent Stearns presented

18  him with a Miranda waiver and locked the door. *See id.* at 73:25–74:5. Descoteaux said

19  that Special Agent Stearns then started an interrogation about fifteen minutes in, told him

20  he had to confess, and read from a paper telling him what the allegations were. *Id.* at

21  75:8–19. He further testified that Special Agent Stearns said that a polygraph was not

22

needed because "the allegations of the witness were so compelling that [Descoteaux] just had to confess." *Id.* at 74:24–75:1.

Descoteaux then testified that he asked to leave, and that Special Agent Stearns told him he had waived that right and would walk out if he gave a confession. *Id.* at 75:20–76:4. Descoteaux stated that Special Agent Stearns became more forceful and began arguing with Descoteaux about the accusations. *See id.* at 77:4–12. Descoteaux testified that when the two were arguing, Special Agent Stearns shifted from behind the desk and leaned towards Descoteaux with his right hand on his firearm and with his left hand holding papers of the allegations. *Id.* at 78:11–21. Descoteaux further testified that every time Special Agent Stearns was making a point, he would squeeze the grip of the firearm. *Id.* At this point, Descoteaux said he started to get very nervous and scared. *Id.* Special Agent Stearns apparently told Descoteaux that a confession would give him three to six months, but without a confession, the judge would sentence him to ten years or more. *Id.* at 76:15–22. Descoteaux testified that he felt like he had to answer Special Agent Stearns' questions and give a full confession. *Id.* at 77:23–78:3.

Descoteaux prepared a handwritten statement and testified that Special Agent Stearns told him what to write. *Id.* at 79:11–20. On cross-examination, Descoteaux clarified that Special Agent Stearns did not tell him word-for-word what to write but the subject matter. *Id.* at 104:7–9. Descoteaux testified that Special Agent Stearns told him to address the statement to a generic judge and to put a statement at the beginning that the confession was of his own free will. *Id.* at 79:11–20. The written statement was not addressed to a judge. *See id.* at 105:3–19. Descoteaux additionally stated that Special

1    Agent Stearns told him to "[d]o [his] best to create a scenario" and how many sexual

2    incidents to include. *See id.* at 79:21–25. Special Agent Stearns allegedly read from a

3    paper that had a list of the allegations made by MV, and Descoteaux and Special Agent

4    Stearns "engaged in a back and forth with ideas." *Id.* at 109:16–110:6. On cross-

5    examination, when confronted the details of his written statement, Descoteaux could not

6    recall exactly what he created and what Special Agent Stearns told him to write. *See, e.g.*,

7    111:16–24.

8         Descoteaux testified that he was in a panic mode when writing the confession and

9    thought that he was going to be shot or otherwise harmed; he stated that he just wanted to

10   give Special Agent Stearns whatever he wanted to walk out that door. *See id.* at 80:17–

11   81:1. He additionally testified that he was having symptoms and manifestations of PTSD

12   and that he felt the interview was coercive. *Id.* at 130:25–131:8, 131:14–21.

13        In its November 22, 2019 Order, the Court identified eight categories of evidence:

14   (1) MV's statements recounting sexual abuse in both jurisdictions; (2) Descoteaux's

15   recorded admission to Howard that "when it was happening I knew it was wrong" but

16   MV wanted "it" and liked "it" too; (3) Descoteaux's recorded admission to his mother

17   that MV was the one who "came on" to him, that he "should have known better, but

18   that's what happened" and that MV has "forgiven" him and was not "damaged;"

19   (4) Descoteaux's recorded attempts to ingratiate himself to MV and Howard after his

20   arrest; (5) Descoteaux's April 22, 2016 handwritten confession; (6) the statement of facts

21   in the plea agreement that Descoteaux adopted in full while under oath; (7) Descoteaux's

22   acknowledgment of guilt at sentencing during allocution; and (8) Descoteaux's

1   acknowledgement of guilt at sentencing through a letter of acceptance. Dkt. 18 at 19–20

2   (internal citations omitted). On cross-examination, the Government presented a ninth

3   evidentiary category: Descoteaux's April 14, 2016 recorded law enforcement interview.

4   *See* Transcript at 121:6–11; *see also* Dkt. 38.[2] In the April 14 interview, Descoteaux

5   stated that he did not recall ever sexually touching MV but that MV "is a pretty honest

6   girl." Transcript at 126:24–127:1; Exhibit B at 17:10. And when questioned whether

7   there was "no doubt that these incidents occurred" in Louisiana and Washington,

8   Descoteaux responded "yeah, because that's where I drank." Exhibit B at 30:45. He also

9   stated in the earlier April 14 interview: "I'm not going to deny it. [MV] is a pretty honest

10  kid. I'm not going to deny anything. Do a polygraph if you want. Yes, yes, it happened.

11  So you know." Transcript at 129:23–130:2; Exhibit B at 1:02:50.

12      During the evidentiary hearing, Descoteaux also testified as to his relationship

13  with his attorney, Lance Hester. Descoteaux met with Hester two times prior to the plea

14  for approximately thirty minutes each meeting. Transcript at 81:24–82:4. Descoteaux told

15  Hester about the April 22 interview and that he would like to suppress the confession. *Id.*

16  at 82:10–11. He testified that Hester tried to discourage him from suppressing the

17  confession and told him "that confessions cannot be suppressed" and, even if the

18  suppression motion prevailed, it still would not make a difference to his case. *Id.* at

19  81:12–19. Hester did not discuss what the law of suppression is or how a suppression

20

21      [2] The April 14, 2016 recorded interview was received in physical format. The Court cites
    to the portion of the evidentiary hearing transcript discussing the interview and the exhibit itself
22  as Exhibit B.

1   motion is filed. *Id.* at 85:5–9. Descoteaux testified that if Hester had investigated the

2   interview, counseled him on the law, and discussed the benefits and risks of filing a

3   suppression motion, he would have asked Hester to file a motion to suppress. *Id.* at

4   86:22–87:1. Descoteaux felt that he would have succeeded on the suppression motion and

5   would have gone to trial and prevailed. *Id.* at 86:6–13.

6        Descoteaux and Hester discussed the plea agreement for a total of thirty to forty-

7   five minutes, approximately ten minutes on the day of the plea and a phone conversation

8   prior to the day of the plea. *See id.* at 83:2–14. Descoteaux testified that he felt pressured

9   to take the plea deal because Hester told him he had to sign a plea before his one-year

10  anniversary of being arrested or Louisiana would take jurisdiction and he would

11  immediately be put on trial. *Id.* at 87:2–18. Descoteaux stated that he felt compelled to

12  admit to the facts of the plea deal and to admit responsibility to the Court. *See id.* at 88:4–

13  19. He also stated that he was trying to stick to his statements to the best that he could in

14  his prison phone calls to his mother and wife at the time. *Id.* at 88:20–89:9. Descoteaux

15  testified that he was suicidal and remembers very little about the conversations from May

16  2016. *Id.* at 96:22–97:10.

17       In sum, Descoteaux's testimony was that he was experiencing PTSD during the

18  April 22 polygraph examination and interview with Special Agent Stearns, that he gave a

19  confession because he wanted to end the conflict, that the confession was coerced

20  because of his PTSD and Special Agent Stearns' "brandishing" of his firearm, and that he

21  believes the confession should have been suppressed.

22

1           **4.**      **Lance Hester**

2           Hester is an attorney based in Tacoma, Washington and has been practicing for

3 twenty-five years. Transcript at 133:20–22, 134:13–17. Over the course of his career,

4 Hester estimates that 50% of his caseload has been criminal defense cases, with

5 approximately forty federal cases from the Criminal Justice Act ("CJA") panel. *Id.* at

6 134:23–134:7, 134:21–135:4. Hester was appointed as Descoteaux's attorney in February

7 2017 through the CJA panel after Linda Sullivan was terminated as Descoteaux's

8 counsel. *See id.* at 136:18–137:10.

9           Hester spoke with Sullivan early on in the transfer of representation process and

10 generally discussed the case. *See id.* at 137:17–138:11. Hester was assigned Descoteaux's

11 case following lengthy negotiations between the Government, Sullivan, and Descoteaux

12 about a global resolution of the Washington charges and the Louisiana charges. *See id.* at

13 138:12–16, 140:23–141:2. Hester testified that it was his understanding that, at the time

14 he became Descoteaux's counsel, Sullivan, Descoteaux, and the Government had

15 negotiated an outcome whereby Descoteaux would plead to offenses from both the

16 Washington and Louisiana indictments that would be lesser than the 30-to-life offenses

17 that Descoteaux was originally indicted on. *Id.* at 144:7–14. The parties at that point in

18 the negotiation agreed that they would jointly recommend a sentence of 25 years. *See id.*

19 at 145:16–21. Hester was able to further negotiate the joint recommendation to 23 years.

20 *Id.* at 146:1–11.

21           When Hester first met with Descoteaux, Descoteaux expressed that he felt that his

22 April 22 written confession was not completely voluntary and that he was hopeful Hester

1    could improve the deal negotiated between Sullivan and the Government. *See id.* at

2    148:23–149:15. Descoteaux further told Hester that he felt like he had no choice but to

3    write down his confession to satisfy the FBI agent. *See id.* at 150:7–12, 156:2–9. Hester

4    testified that, in a "global view of the situation," the April 22 confession was not an issue

5    worth litigating. *Id.* at 156:10–15.

6        Hester informed Descoteaux that it is difficult to overcome the testimony of an

7    officer and that the Court would have to decide if Descoteaux is more credible than the

8    FBI agent. *Id.* at 156:16–22. Hester further testified that, relative to the plea deal, he did

9    not feel that he had a duty to "spell out the law of suppression of an involuntary

10   statement" to Descoteaux. *Id.* at 157:8–19. Additionally, Hester did not conduct a factual

11   investigation with regard to the polygraph interview nor consult with any experts. *See id.*

12   at 163:17–23. In sum, Hester did not think he would successfully keep out Descoteaux's

13   April 22 confession. *Id.* at 160:22–24.

14       **5.    Special Agent Andrew Stearns**

15       Special Agent Stearns is currently the chief of the FBI's polygraph program and

16   became a certified polygraph examiner in 2014. Transcript at 174:18–175:3. Special

17   Agent Stearns has conducted approximately 1,000 polygraph examinations over the

18   course of his career, of which 100 have involved child exploitation. *Id.* at 175:23–176:9.

19   Special Agent Stearns estimates that in about 70% of his examinations he has been able

20   to achieve "an admission or some sort of extra information." *Id.* at 176:10–18.

21       Special Agent Stearns was asked to conduct Descoteaux's polygraph on behalf of

22   another FBI agent who was investigating the possible sexual assault of a child. *Id.* at

177:13–18. In preparation for the exam, Special Agent Stearns reviewed the case

documents but did not recall reviewing MV's forensic interview. *See id.* at 179:4–20. The

polygraph examination occurred on April 22, 2016 at the FBI office in Cheyenne,

Wyoming. *Id.* at 180:2–4.

Special Agent Stearns set up the polygraph examination in a smaller sized

conference room. *Id.* at 180:7–17. He was also carrying a firearm that day since he was

on duty; Special Agent Stearns testified that it is his normal practice to carry his firearm

on his ankle when traveling but could not recall specifically how he carried his firearm on

April 22. *Id.* at 180:25–181:8. He testified that it is his "unwavering practice" to keep his

firearm holstered at all times and to keep that firearm covered in some fashion, either on

his ankle or with a sport coat. *Id.* at 186:7–17

Special Agent Stearns commenced the polygraph examination process by

informing Descoteaux that the exam was a voluntary process and having Descoteaux

execute an advice of rights and consent to interview with polygraph form. *See id.* at

181:9–182:2; *see also* Dkt. 38-1. The interview lasted about two hours, and Special

Agent Stearns testified that, during the course of his initial conversation with Descoteaux,

Descoteaux began making admissions and confessions about twenty to twenty-five

minutes in. Transcript at 188:16–23, 197:17–22. A polygraph examination did not occur

because of the confessions, and Special Agent Stearns testified it is not uncommon for

that series of event to occur. *Id.* at 188:24–189:8 ("That's not uncommon for that to

happen, that someone would sit and we could have a conversation together, and then

someone would eventually confess or make admissions. It would be completely

1   reasonable, based on that, that the need for the polygraph would go away."). Special

2   Agent Stearns' testimony was that, within twenty-five minutes of the interview,

3   Descoteaux explained that he did actually remember the abuse and that the alcohol had

4   not impaired his memory and then began giving details in his confession. *Id.* at 200:10–

5   13.

6          Special Agent Stearns disagreed with Descoteaux's characterization of the

7   interview and confession. He testified that he did not lock the door at any point and did

8   not advise Descoteaux that he was not free to leave. *Id.* at 210:15–20. He additionally

9   testified that both he and Descoteaux were seated at a conference table during the

10  interview. *See id.* at 187:2–10. Special Agent Stearns denied providing Descoteaux any

11  specific information to include in the written confession and testified that he likely

12  recommended that Descoteaux be thorough, complete, and truthful in his statement. *See*

13  *id.* at 190:8–18. He further denied any possibility that he dictated Descoteaux's

14  handwritten statement or that he would have threatened Descoteaux to coerce statements.

15  *Id.* at 190:19–191:7. He additionally denied making statements to Descoteaux that if he

16  provided a good confession the judge would be more lenient at sentencing. *Id.* at 212:7–

17  10. Special Agent Stearns testified that the only encouragement he would have given

18  would have been for Descoteaux to be truthful and honest. *Id.* at 212:20–213:3.

19         Special Agent Stearns' testimony also was in some conflict with Descoteaux's

20  polygraph expert's testimony. Contrary to Smith's testimony, Special Agent Stearns

21  persuasively testified that someone who may not remember specific events because they

22  were intoxicated at the time would be a good candidate for a polygraph exam because it

is not certain the subject is being truthful about their level of recollection of events. *Id.* at

189:19–190:4; *see also id.* at 202:9–203:3. He also testified that it is not uncommon for a

polygraph examiner to take a confession from a subject without administering a

polygraph exam. *See id.* at 188:24–189:8. Moreover, Special Agent Stearns testified that

he is unfamiliar with APA standards and is certified through the federal polygraph

school, the National Center for Credibility Assessment, whose certification does not

contain the APA requirements described by Smith. *See id.* at 194:3–15. Though he did

not disagree with some APA standards like being objective. *See id.* at 194:16–21. The

Court does not find that Special Agent Stearns, in conducting the interview, violated any

federally adopted standards in conducting the April 22 interview.

### 6.    Special Agent Tory Smith

Special Agent Smith is an FBI agent who investigated Descoteaux's case

beginning in April 2016. *See* Transcript at 214:25–215:14. Special Agent Smith

interviewed Descoteaux on April 14, 2016 for three hours—approximately one week

before the scheduled April 22 polygraph examination. *Id.* at 216:4–10; 217:10–12. The

interview occurred in the early stages of the investigation, and Special Agent Smith

testified that Descoteaux admitted to hands-on sexual contact with MV but could not

recall specific instances of abuse because he would get black out drunk. *See id.* at

218:16–219:7. After the April 14 interview, Special Agent Smith did not believe the case

was ready for referral for prosecution and asked Descoteaux if he would be willing to do

a polygraph examination. *See id.* at 220:15–221:1; 222:3–6. Special Agent Smith

1   discussed the nature of the investigation and the April 14 interview with Special Agent

2   Stearns prior to Special Agent Stearns' scheduled polygraph examination.

3   **7.   Post-Evidentiary Hearing**

4   Following the evidentiary hearing, the Court requested that the parties file post-

5   hearing briefing. Dkt. 37. The Government and Descoteaux simultaneously filed their

6   opening briefs on April 1, 2022, Dkts. 41, 42, and responded on April 15, 2022, Dkts. 43,

7   44. Descoteaux's remaining grounds are now ripe for consideration.

8   **II.   DISCUSSION**

9   **A.   Standards**

10   Under 28 U.S.C. § 2255, the Court may grant relief to a federal prisoner who

11   challenges the imposition or length of his incarceration on the ground that: (1) the

12   sentence was imposed in violation of the Constitution or laws of the United States; (2) the

13   Court was without jurisdiction to impose such sentence; (3) the sentence was in excess of

14   the maximum authorized by law; or (4) the sentence is otherwise subject to collateral

15   attack. 28 U.S.C. § 2255(a). If the motion is not summarily dismissed, "the court

16   shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact

17   and conclusions of law with respect thereto." *Id.* at § 2255(b).

18   Descoteaux's sentence is subject to collateral attack through his claims of

19   ineffective assistance of counsel. The Sixth Amendment guarantees a criminal defendant

20   the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687

21   (1984). The Court evaluates ineffective assistance of counsel claims under the two-prong

22   test set forth in *Strickland.* To prevail under *Strickland*, a defendant must prove (1) that

his counsel's performance was deficient, and (2) that this deficient performance was prejudicial. *Id.* The Court must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

In *Hill v. Lockhart*, the Supreme Court confirmed that the *Strickland* test governs challenges to guilty pleas based on the ineffective assistance of counsel. 474 U.S. 52, 58–59 (1985). A defendant who pleads guilty upon the advice of counsel may only attack the voluntary nature of the guilty plea by showing that the advice he received from counsel to enter the plea was ineffective. *Id.* at 56–57 (citing *Tollet v. Henderson*, 411 U.S. 258, 267 (1973)). An attorney's advice to enter a plea is ineffective if it falls below "the range of competence demanded of attorneys in criminal cases." *Id.* at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). With respect to *Strickland*'s prejudice requirement, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59 (footnote omitted). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

**B.    Merits**

The remaining issue can be divided into two components: first, whether Hester, by failing to fully inform Descoteaux of the potential motion to suppress his April 26 confession, "fell below an objective standard of reasonableness," *id.* at 688, and second, whether by falling below the standard, Hester's performance was prejudicial, *id.* at 687. The Court is not required to address both questions and may consider them in any order. *Id.* at 697.

1          The Court first examines whether Descoteaux would have been prejudiced by

2   Hester's alleged error in failing to file a suppression motion. Indeed, Descoteaux

3   concedes that if the Court "concludes there was no viable suppression motion, his

4   prejudice argument fails." Dkt. 42 at 14. The viability of Descoteaux's remaining

5   grounds thus turns on whether his April 22, 2016 confession was coerced and should

6   have been suppressed if Descoteaux elected to go to trial.

7          The United States Constitution requires that any confession admitted at trial be

8   voluntarily given. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). In determining

9   whether a confession was voluntary, courts examine "whether a defendant's will was

10  overborne by the circumstances surrounding the giving of a confession." *Id.* at

11  434 (internal quotation omitted). "The due process test takes into consideration 'the

12  totality of all the surrounding circumstances—both the characteristics of the accused and

13  the details of the interrogation.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218,

14  226 (1973)); *see also Arizona v. Fulminante*, 499 U.S. 279, 285–88 (1991). "The

15  determination 'depend[s] upon a weighing of the circumstances of pressure against the

16  power of resistance of the person confessing.'" *Dickerson*, 530 U.S. at 434 (quoting *Stein

17  v. New York*, 346 U.S. 156, 185 (1953)).

18         The circumstances the Supreme Court has looked to in analyzing the totality of the

19  circumstances include: the "crucial element of police coercion;" the length of the

20  interrogation, its location, and its continuity; and the defendant's maturity, education,

21  physical condition, and mental health. *Withrow v. Williams*, 507 U.S. 680, 693 (1993);

22  *see also Schneckloth*, 412 U.S. at 226. "Coercion can be mental or physical, but to render

1    a statement involuntary, coercion must exist to such a degree that the statement is not 'the

2    product of an essentially free and unconstrained choice by its maker.'" *Juan H. v. Allen*,

3    408 F.3d 1262, 1273 (9th Cir. 2005) (quoting *Schneckloth*, 412 U.S. at 225).

4        As the Court previously noted, "the merits of [Descoteaux's] motion hinge on the

5    veracity of its factual allegations and the credibility of its author." Dkt. 18 at 26. The

6    Court finds that there was no coercion and that Descoteaux and his factual allegations

7    about the April 22 interview lack credibility. There was no viable suppression motion,

8    and thus no prejudice to Descoteaux.

9        It is firstly of concern to the Court that Descoteaux testified that he was suicidal

10   during the time period in question, i.e., April and May 2016, and does not remember in

11   detail his phone conversations with his then-wife and mother but does remember

12   extensive details of the April 22 interview and conversations with Hester. Descoteaux's

13   testimony was also inconsistent about how Special Agent Stearns coerced him into

14   writing his confession. His testimony at first was that Special Agent Stearns told him

15   what to write and to address the confession to a generic judge. Descoteaux's testimony

16   then evolved into Special Agent Stearns telling him to create a scenario and reaffirming

17   his decisions as to how many instances of sexual abuse occurred. Then on cross

18   examination, Descoteaux stated that Special Agent Stearns provided the subject matter

19   and guidance on what to write. He further testified that he was given "creative license."

20   Transcript at 107:4. Descoteaux was additionally impeached. He testified on direct

21   examination that Special Agent Stearns told him to address his letter to a generic judge,

22

1   but when confronted with his written confession, Descoteaux admitted that the letter was

2   not addressed as such. *See id.* at 105:3–19.

3       Descoteaux's credibility was further brought into question by his assertion that

4   Special Agent Stearns "brandished" a weapon during the April 22 interview. In his

5   habeas petition, Descoteaux asserts that Special Agent Stearns "repeatedly brandished his

6   weapon," causing him to believe that "he was in danger of being shot." Dkt. 1 at 8. When

7   questioned about Special Agent Stearns' "brandishing," Descoteaux clarified that Special

8   Agent Stearns leaned in with his right hip with his hand on his firearm and that he would

9   squeeze the grip when making a statement. *See* Transcript at 78:13–21. Descoteaux

10  explained he found the narrow definition of "brandish" as "placed his hand on his

11  weapon" under 18 U.S.C. § 924(c)(4). *Id.* at 78:22–79:2. Descoteaux's inconsistences in

12  his testimony, in tandem with his lapses in memory and habeas petition, lead the Court to

13  find Descoteaux to lack credibility.

14      Special Agent Stearns' testimony was unimpeached and was more credible than

15  Descoteaux's version of events. Special Agent Stearns agreed with Descoteaux that a

16  polygraph never occurred, but the sequence of events transpired because Descoteaux

17  began to voluntarily confess, not because Special Agent Stearns began to threaten or

18  coerce Descoteaux to confess. Special Agent Stearns further agreed that he had a firearm

19  on him during the interview; and although he could not recall whether the firearm was

20  holstered on his ankle or beneath his sport coat, it was likely concealed. Even if

21  Descoteaux saw the firearm, it was incidental and unintentional. Special Agent Stearns'

22  recollection of events was consistent and credible.

1    The Court thus finds the following. Special Agent Stearns did not brandish his

2    firearm and coerce Descoteaux into giving a false confession. Nor did Special Agent

3    Stearns lock the door and tell Descoteaux he was not free to leave. After twenty to

4    twenty-five minutes of building rapport with Special Agent Stearns, Descoteaux

5    confessed and then wrote a detailed confession. Special Agent Stearns did not have MV's

6    allegations with him and did not provide the details of her allegations to Descoteaux.

7        Furthermore, the Court cannot find that the April 22 confession was coercive as a

8    result of Descoteaux's PTSD. Dr. Bailey did conclude that Descoteaux suffers from

9    chronic posttraumatic stress disorder. Dkt. 34 at 8. But Dr. Bailey's conclusion that

10   Descoteaux was experiencing posttraumatic symptoms was based upon Descoteaux's

11   version of the April 22 interview, which the Court has found to be uncredible. Dr.

12   Bailey's opinion that Descoteaux's PTSD had some impact on his perception of events

13   falls short of saying his PTSD, to a reasonable degree of medical certainty, rendered

14   Descoteaux unable to voluntarily participate on April 22.

15       Descoteaux was also able to successfully participate in an FBI interview

16   approximately one week before the April 22 confession on April 14. There was no

17   evidence presented that those statements and admissions were a product of Descoteaux's

18   PTSD. And, notwithstanding Dr. Bailey's testimony, Descoteaux's demeanor during the

19   April 14 interview is consistent with Special Agent Stearns' version of events, only

20   further bolstering Special Agent Stearns' credibility. There is nothing in the evidentiary

21   record that Descoteaux's voluntariness and ability to freely participate on April 14

22   changed a week later with Special Agent Stearns. Descoteaux's willingness to be open

1   and forthcoming about MV's allegations is additionally supported by his phone calls to

2   his mother and wife at the time.

3          In sum, a motion to suppress would not have been viable because the Court finds

4   Descoteaux and his factual allegations to lack credibility. Considering the totality of the

5   circumstances, Descoteaux's written statement was "the product of an essentially free and

6   unconstrained choice by its maker." *Juan H.*, 408 F.3d at 1273 (internal quotation

7   omitted).

8          But even if the suppression motion were successful and Hester's failure in

9   bringing the motion was deficient performance, the Court concludes that a failure to file

10  the motion would not result in any prejudice because of the weight of evidence. The

11  Court previously categorized eight pieces of evidence, *see* Dkt. 18 at 19–20, and the

12  Government introduced a ninth at the evidentiary hearing. The Court did not previously

13  consider items one, four, five, seven, and eight for reasons detailed in the Court's

14  underlying November 22, 2019 Order, *see id.* at 20–24, but found that the recorded

15  admissions, items two and three, established that "Descoteaux committed at least one act

16  of sexual abuse against MV and are strong circumstantial evidence corroborating

17  Descoteaux's guilt as indicated by the statement of facts in the plea agreement," *id.* at 24.

18         The newly introduced ninth item of evidence—the April 14 interview—only

19  bolsters this conclusion. First, when asked if there was no doubt that the incidents

20  occurred in Louisiana and Washington, Descoteaux responded, "Yeah because that's

21  where I drank." Exhibit B at 30:45. He also said it was "plausible" that he ejaculated on

22  MV in the shower, which MV alleged Descoteaux did when living in Louisiana. *Id.* at

1  37:58. These admissions are circumstantial evidence of Descoteaux's location, which the

2  Court previously could not determine. *See* Dkt. 18 at 24 ("Moreover, although courts

3  differ over whether venue can accurately be described as an element of an offense, the

4  admissions provide no evidence of Descoteaux's location."). Descoteaux also leant

5  credibility to MV, calling her "a pretty honest kid." Exhibit B at 102:50. He further

6  adopted her statements by stating "I'm not denying anything that [MV] has said." *Id.* at

7  27:30, 29:57. This adoption and evidence of credibility revives, in part, the first category

8  of evidence: MV's statements recounting sexual abuse. The Court acknowledges the

9  hearsay concerns it recognized in the underlying Order, *see* Dkt. 18 at 21, but

10  Descoteaux's adoption of MV's statements permits the Court to give weight to this

11  evidence.

12        Therefore, even if the motion to suppress succeeded, MV's statements recounting

13  the sexual abuse (category one), Descoteaux's recorded admissions to Howard and his

14  mother (categories two and three), and Descoteaux's April 14, 2016 interview (new

15  category nine) provide ample evidence that Descoteaux sexually abused MV on multiple

16  occasions in both Louisiana and Washington. It is likely that the jury would have

17  returned a verdict of guilty based on this evidence, and Descoteaux has not shown a

18  "reasonable probability that, but for counsel's unprofessional errors, the result of the

19  proceeding would have been different." *Strickland*, 466 U.S. at 694. The Court does not

20  make a finding as to whether Hester's performance was deficient, but assuming that it

21  was, even if the motion to suppress succeeded, there would be no prejudice to

22  Descoteaux because of the strength of the evidence.

1    Descoteaux has failed to establish that Hester's performance caused him prejudice,

2    and, consequently, his remaining grounds fail and his § 2255 petition is denied.

3    **C.    Certificate of Appealability**

4    A petitioner must receive a certificate of appealability ("COA") to appeal the

5    denial of a motion brought pursuant to § 2255. 28 U.S.C. § 2253(c)(1); Fed. R. App. P.

6    22(b). The Court should grant a COA if the petitioner makes "a substantial showing of

7    the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S.

8    473, 483–84 (2000). The substantial showing standard is satisfied if reasonable jurists

9    could disagree over the Court's resolution of the motion. *Slack*, 529 U.S. at 484.

10   In this case, the Court declines to issue a COA. The Court's conclusion that

11   Descoteaux fails to show prejudice is beyond debate. Therefore, even if reasonable jurists

12   could disagree over whether Hester's assistance in the criminal case was ineffective,

13   Descoteaux has failed to make a substantial showing of the denial of his constitutional

14   rights because he failed to establish prejudice.

15   \\

16   \\

17   \\

18   \\

19   \\

20   \\

21   \\

22   \\

1

### III.  ORDER

2        Therefore, it is hereby **ORDERED** that Ground I and Ground III, the sole

3   remaining claims from Petitioner Kenneth Descoteaux's motion to vacate, set aside, or

4   reduce sentence, Dkt. 1, are **DENIED**.

5        The Clerk shall enter a JUDGMENT and close the case.

6        Dated this 13th day of May, 2022.

7

8        _____

9        BENJAMIN H. SETTLE
         United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22